Filed 6/23/25  In re A.W. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re A.W., a Person Coming Under the Juvenile Court Law. | C102370 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES, Plaintiff and Respondent, v. M.C., Defendant and Appellant. | (Super. Ct. No. JD243000) |

Appellant M.C., mother of minor A.W., appeals from the juvenile court's jurisdictional and dispositional orders finding that the minor comes within Welfare and Institutions Code section 300, subdivision (b) and adjudging the minor a dependent. (Welf. & Inst. Code,[1] §§ 300, 361, 395.)  She contends the evidence was insufficient to support jurisdiction.  Disagreeing, we affirm.

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

On May 31, 2024, Sacramento County Department of Child, Family and Adult Services (Department) received a referral that father had left the then four-year-old minor unattended in the car for an unknown period while he looked for mother who was attending a therapy session. The car had been left running, the windows were down, and the minor was saying "hello" to people as they walked by. Mother went outside, heard the minor report that father had left the car to locate mother, and abruptly went back inside the building to locate father. Mother and father then began arguing. Father had glazed-over eyes and was flailing his arms, acting erratically, and security asked him to leave the building due to his combative behavior. Mother was reported to have a history of mental health issues and parents had previously engaged in domestic violence with father assaulting mother in the family home.

On June 3, 2024, the Department attempted a visit at the family home. Father appeared very thin with glazed-over eyes. He did not make eye contact, spoke erratically about the government and demanded to know "who dispatched you to my home." The social worker scheduled an appointment for the next day.

On June 4, 2024, the social worker returned to the family home where mother answered the door and immediately began to video record the social worker. Mother refused to allow the social worker into the home, refused to listen to any explanation about the reason for the visit, refused to allow the social worker to view the minor, and informed the social worker that she felt "threatened." The social worker immediately terminated the visit and contacted the local sheriff's department. Deputies went to the family home to conduct a welfare check. The parents would not allow the deputies to speak to the minor, but the deputies were able to view the minor through the window and the minor appeared healthy and not distressed.

On June 8, 2024, father drove his car recklessly with the minor unrestrained in the back seat. He was traveling the wrong direction on the road at a speed of 80 miles per

hour in a 40-mile-an-hour zone, hit a telephone pole, multiple fences, and a car before crashing into a building. He then fled the scene on foot, leaving the injured minor in the car. The minor was found scared and alone in the back seat with abrasions and cuts from broken glass. Mother arrived on scene saying, "my daughter's supposed to be with the dad, but I'm not sure." Mother was uncooperative with law enforcement, refused to provide her name and refused to identify father's photo in a lineup (although she confirmed his photo was included in the lineup). The minor was taken to the hospital and discharged to mother with a recommendation she been seen by her pediatrician as soon as possible.

On June 9, 2024, a social worker went to the family home. Mother answered the door while filming the social worker. The social worker terminated the encounter but was permitted to see the minor through the open door and was able to confirm that the minor did not appear to be in distress.

A social worker spoke with mother's therapist on June 11, 2024. Mother was pregnant and had recently been referred to therapy by the obstetrics/gynecology department. Mother had not yet completed her assessment but had completed two individual sessions and two group sessions. The therapist told the social worker that mother had an extensive mental health history that included depression, anxiety, self-harm, and suicide attempts and ideations. Mother's mental state was reportedly quite fragile, and the therapist said she has anti-governmental ideology. The therapist further reported mother had disclosed she and father used red wine and marijuana in the mornings to help them deal with their anger. Otherwise, mother reported, her anger is "off the charts." Mother reported that they were presently out of wine and funds to purchase more.

On June 12, 2024, the probation department confirmed that father is on probation for a 2020 domestic violence conviction involving mother. Father had not checked in as required in the last four months, nor had he completed parenting and batterers treatment,

3

as ordered. There was an active warrant for his arrest for missing a court date and father had been reporting his address as "homeless/unhoused," even though he was living with mother. The probation officer called mother with the social worker on the phone and mother answered, informing the officer that she was recording the call and she was "the Secretary for their Sovereign Prophecy Church and that the father was not available." The California Highway Patrol officer following up on the collision reported that father also had an active warrant for a prior domestic violence matter with mother and that another warrant was being sought in connection with the collision.

The Department obtained, but was unable to execute, a protective custody warrant. On June 20, 2024, father stood in front of the window but refused to come to the door or engage with the social worker or sheriff deputies. The following day, the blinds were open, but no one answered the door. The social worker called and spoke with mother on the phone, but mother refused to disclose her whereabouts. Mother provided her email address so the social worker could provide her information about the upcoming detention hearing but said she would not participate in the Department's services.

The Department filed a section 300 petition on behalf of the minor on June 20, 2024, alleging the minor had suffered, or was at risk of suffering, serious physical harm under subdivision (b) due to father being unable or unwilling to properly supervise or protect the minor. In support of this allegation, the petition summarized the facts surrounding the collision. The petition further alleged the minor was at risk as a result of mother's untreated mental health issues that impair her ability to provide adequate care, protection and supervision of the minor. The petition further alleged that mother had been diagnosed with depression and anxiety, was suffering from paranoia and hallucinations, has a history of suicide attempts, and was not currently receiving mental health treatment or taking psychotropic medication, placing the minor at risk of harm, abuse or neglect.

4

Parents argued with and interrupted the juvenile court numerous times at the June 24, 2024, initial hearing, resulting in the juvenile court having to mute them while attempting to explain the protective custody warrant. Parents were ordered to bring the minor to the Department by the following morning. On June 27, 2024, the juvenile court ordered the minor detained from father but authorized placement of the minor with mother if mother and the minor live in the maternal great-grandmother's home.

The July 18, 2024, jurisdiction/disposition report included information received from mother. Mother reported that she was working at the time of the collision, meeting with clients at the family home. She makes money by doing photography for the clients, and father was supposed to be taking the minor to the park to play while she was working from home. Mother also runs a nonprofit church out of the home. Parents are not married but have been together for 10 years and mother was then currently pregnant by father. Mother denied any substance abuse issues and did not believe her mental health issues prevented her from caring for and/or arranging appropriate care for minor. She reported she is actively working on her mental health and the previous year, between August 2023 and February 2024, she had voluntarily placed the minor in the care of the maternal great-grandmother while she worked on her mental health. Mother told the social worker she was transitioning from not working on her mental health to actively dealing with it. She believed father cares for the minor's well-being and that he was able to supervise the minor but that he was going through some "mental health stuff," did not have any resources, and mother was his only support. Mother said she wanted the minor returned and father to have unsupervised visits. Where father was to live was "up to him" but she wanted to return to their apartment. Father's belongings were not at the apartment, although mother later explained the belongings never were in the apartment.

The therapist reported that mother had been proactive in seeking mental health services and had been prescribed sertraline in June 2024. As of July 12, 2024, mother had attended five individual therapy sessions and five group sessions.

The social worker met with mother and the maternal great-grandmother on June 28, 2024, at the maternal great-grandmother's home to review a safety plan, given the juvenile court returned the minor to the mother's care with Department supervision. The safety plan provided that mother and the maternal great-grandmother would not allow father unauthorized contact with the minor or supervise his visits. They agreed to the safety plan.

Father did not make himself available to the Department for an interview and attempts to reach him were unsuccessful. Father's criminal record includes convictions for vehicle theft, evading a police officer, assault with a deadly weapon likely to produce great bodily injury, infliction of corporal injury on a cohabitant, and two grand theft felonies. Mother told the social worker she had not had any contact with father since the June 24, 2024, hearing.

In an August 16, 2024 addendum report, the Department reported it had met mother at her apartment with her newborn, who was born three weeks earlier. Neither father nor his belongings were present in the apartment. The minor was with the maternal great-grandmother. Mother told the social worker that since the collision, she did not trust father and would not leave the minor or the newborn with anyone other than the maternal great-grandmother. Regarding her relationship with father, mother said she had not had any contact with father since the detention hearing. She said they had not spoken about their current relationship status, although mother had previously said that the last time they spoke, father stated that leaving would be better for mother and the children. Mother said that if father were to show up, she did not have any problem telling him to leave if she did not think he was in the right state of mind.

Mother had been participating in individual and group therapy sessions and had been taking her prescribed medication. Accordingly, the Department assessed that the allegation in the original section 300 petition that mother was not currently receiving mental health treatment or taking medication was no longer true and, since mother had

6

been demonstrating a desire to address her mental health issues, the Department recommended that allegation be dismissed. It recommended the juvenile court sustain the allegation the father's failure and/or inability to properly supervise and protect the minor places the minor at substantial risk of serious physical harm, abuse and/or neglect.

Regarding disposition, the Department recommended the juvenile court adjudge the minor a dependent child of the court, order her removed from father and placed under the Department's supervision in mother's custody, and allow mother and the minor to return to their apartment with a safety plan in place that, at a minimum, assures mother does not allow father to reside in the family home or have unsupervised contact with or transport the minor. The Department further recommended services be provided to both parents. Finally, the Department recommended the juvenile court set an appearance progress hearing in 90 days to assess whether mother remains medication compliant and whether the case should remain open.

On September 20, 2024, the Department filed an amended section 300 petition, repeating the allegations relating to father but removing the allegation relating to mother's mental health and adding new allegations that mother failed to protect the minor from father. The petition specifically alleged that mother knew or reasonably should know that father was an inappropriate caregiver yet continues to leave the minor alone in father's care, placing the minor at substantial risk of serious physical harm, abuse or neglect.

In a September 23, 2024 addendum report, the Department reported that mother had refused to sign an updated safety plan, missed two meetings with the Department, and had not been reachable and/or amenable to scheduling a Child Family Team (CFT) meeting. The social worker had met with mother on August 16, 2024, to discuss case planning. The social worker spoke with mother about the written safety plan regarding steps to be taken to keep the minor safe, but mother refused to sign a written safety plan,

7

as she felt she was being forced. When the social worker asked to speak to the minor alone, mother asked the social worker to leave the home.

The social worker attempted to visit again on August 29, 2024, but mother did not answer the door. Mother texted the social worker that she would not be able to keep the appointment because she was out running errands. On September 19, 2024, mother texted the social worker and reported she would not be able to meet as scheduled the following day because her therapy times had changed. No CFT meeting had been scheduled because mother had not responded to several attempts to schedule the meeting.

The contested jurisdiction/disposition hearing took place on October 2, 2024. Father was not present and mother did not testify. The juvenile court found the allegations in the amended petition true, adjudicated the minor a dependent child of the court and placed her in mother's care under the Department's supervision. Mother was provided family maintenance services and a review hearing was set, with an interim review hearing set for December 2, 2024.

Mother appeals. The matter was fully briefed in this court on March 27, 2025.

## DISCUSSION

Mother challenges the juvenile court's jurisdiction, arguing there was insufficient evidence the minor remained at risk at the time of the jurisdiction and disposition hearing. We conclude the evidence is sufficient to support jurisdiction.

The Department has the burden to prove jurisdiction by a preponderance of the evidence. (§ 355, subd. (a); *In re I.J.* (2013) 56 Cal.4th 766, 773; *In re Matthew S.* (1996) 41 Cal.App.4th 1311, 1318.) We review jurisdictional findings for substantial evidence, reviewing the record in the light most favorable to the judgment and drawing all reasonable inferences from the evidence to support the findings and orders of the dependency court. (*In re I.J.*, at p. 773.)

Subdivision (b)(1) of section 300 provides for jurisdiction when the child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or

8

illness, as a result of any of the following:  [¶]  (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child.  [¶]  (B) The willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left."  " 'In determining whether the child is in present need of the juvenile court's protection, the court may consider past events.' "  (*In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1135, disapproved on another ground in *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.)

The purpose of dependency proceedings is to protect children.  (§ 300.2.)  The court asserts jurisdiction with respect to a child when one of the statutory prerequisites listed in section 300 has been demonstrated.  (*In re I.A.* (2011) 201 Cal.App.4th 1484, 1491.)  The juvenile court has grounds for jurisdiction if the actions of either parent bring the minor within any of the statutory definitions in section 300.  (*In re Joshua G.* (2005) 129 Cal.App.4th 189, 202.)  Because the focus is on the child, it is necessary for the court to find that only one parent's conduct has created circumstances triggering section 300 for the court to assert jurisdiction over the child.  (*In re I.A.*, at p. 1491.)  "[I]t is irrelevant which parent created those circumstances."  (*Id.* at p. 1492; see *In re Jeffrey P.* (1990) 218 Cal.App.3d 1548, 1554 [social services " 'is not required to prove two petitions, one against the mother and one against the father, in order for the court to properly sustain a petition' " pursuant to section 300].)

Here, the minor has suffered serious physical harm at the hands of father (that caused a hospital visit with a recommendation that the minor be seen by her pediatrician as soon as possible), who is unable or unwilling to properly supervise and protect the minor.  And as the minor's presumed father, he has a legal right to custody of the minor, even though he has temporarily absented himself from the family home and, therefore, the minor remains at substantial risk of suffering serious physical harm at the hands of father.  (Fam. Code, § 3010 ["The mother of an unemancipated minor child and the

father, if presumed to be the father under Section 7611, are equally entitled to the custody of the child"].)  Mother does not contest the juvenile court's findings under section 300, subdivision (b), as to father -- impliedly conceding those findings justified the court's exercise of jurisdiction.  (*In re Joshua G.*, *supra*, 129 Cal.App.4th at p. 202.)

As for the minor being at risk because mother failed to protect her, mother failed to protect the minor by repeatedly placing the minor under father's supervision, despite knowing he is an inappropriate caregiver.  While mother now argues the minor was no longer at risk by the time of the jurisdiction hearing, the evidence supports the juvenile court's finding to the contrary.

Parents have a 10-year relationship with two children, including a newborn child. Mother remained in this relationship, despite severe anger issues, domestic violence, and father's repeated actions placing the minor at risk.  There was no evidence father had left their home at mother's behest or that he would remain out of the home.  There had been no discussion about the current nature of their relationship or its termination.  The evidence was only that father had temporarily and voluntarily absented himself from the family home and that mother had not talked to him for a few months.

Even after the collision which injured the minor, mother maintained father was able to supervise the minor and wanted him to have unsupervised visits.  While mother later claimed that, since the collision, she did not trust father with the minor, she had previously said otherwise, and the juvenile court was not required to credit the more recent statement.  And while mother also claimed that her main concern is the safety of her children, she thereafter refused to sign an updated safety plan, repeatedly missed meetings with the social worker, and failed to respond to attempts to schedule a CFT meeting.  Moreover, mother did not express her unqualified willingness to exclude father from their home once she moved back into the apartment.  Instead, she said it was up to father where he would live and that she did not have any problem telling him to leave *if*

10

*she did not think he was in the right state of mind*. Thus, there was little assurance that mother would protect the minor from her father.

Mother's reliance on *In re A.G.* (2013) 220 Cal.App.4th 675, as support for her contention that jurisdiction was not necessary, is unavailing. In that case, the mother appealed from the judgment entered in her children's dependency proceeding after the juvenile court had sustained a petition under section 300, subdivision (b), based on her mental health issues. (*In re A.G.*, at pp. 677-682.) The mother challenged the jurisdictional finding, contending that, because the father was nonoffending, resided with the children and had always been capable for caring for them, no need existed for juvenile court jurisdiction. (*Id.* at p. 677.) The appellate court agreed, concluding that, despite the mother's mental illness, there had been no showing of harm or a risk thereof based on her condition because the father had shown remarkable dedication to the minors and had been able to protect them from any harm resulting from the mother's mental illness. (*Id.* at pp. 684, 687.) He had ensured that there was adult supervision, other than the mother, of the minors at all times. The father or the nanny was the minors' primary caregiver, while the mother usually stayed in her room. (*Id*. at p. 684.) The father slept in the bedroom with the minors and kept the door locked pursuant to the advice of the in-home counselor and temporarily moved out of the house with the minors to protect them from the mother. (*Ibid.*) Under these circumstances, jurisdiction was not proper, and the matter belonged in family court, where it ultimately ended up after the juvenile court determined the minors were not at risk in the father's custody and awarded him custody in exit orders. (*Id.* at p. 686.) Here, unlike *In re A.G.*, mother was not a nonoffending parent under the petition, had not been able to protect the minor from risk based on father's conduct, and did not take measures to protect the minor from father. Instead, mother repeatedly demonstrated an inability or refusal to take action to protect the minor from father, whom she does not dispute, places the minor at substantial risk of harm.

11

We conclude there is substantial evidence to support the juvenile court's jurisdictional findings.  In light of this conclusion, we need not address mother's additional contention that the juvenile court "abused its discretion when it made dispositional orders based on its erroneous jurisdictional findings."  (Capitalization omitted.)

DISPOSITION

The orders and judgment of the juvenile court are affirmed.


　　　　　　　　　　　　　　　　　　　　/s/_____
　　　　　　　　　　　　　　　　　　　　MESIWALA, J.


We concur:


/s/_____
ROBIE, Acting P. J.


/s/_____
RENNER, J.